IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| **LM INSURANCE CORPORATION,** | ) |
| Plaintiff, | ) ) ) |
| vs. | ) No. 04 C 618 ) |
| **SOURCEONE GROUP., INC., a/k/a and d/b/a SOURCE ONE GROUP, LLC, and PAYROLL SERVICES OF VIRGINIA; DALRADA FINANCIAL CORPORATION, a/k/a and d/b/a IMAGING TECHNOLOGIES CORPORATION; EXPERT HR, INC., and EXPERTHR-MICHIGAN, INC.,** | ) ) ) ) ) ) ) ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

Before the court is a motion to dismiss for lack of personal jurisdiction filed by defendants Expert HR, Inc. ("Expert HR") and Expert HR-Michigan, Inc. Both movants are Nevada corporations with their principal places of business in California and are sometimes referred to herein, collectively, as the "Expert HR Entities". For the reasons given below, I deny the motion.

Plaintiff LM Insurance Corporation ("LM") is an Indiana corporation with its principal place of business in Massachusetts. It is licensed to engage in the insurance business in Illinois. LM alleges that Defendant SourceOne Group, Inc. ("SOG"), also known and doing business as Source One Group, LLC. and Payroll Services of Virginia, is a Delaware corporation with its principal place of business in San Diego, California; defendant Dalrada Corporation

(Dalrada) a/k/a and d/b/a Imaging Technologies Corporation ("ITEC") is a Delaware corporation with its principal place of business in San Diego, California; the Expert HR Entities are both Nevada corporations with their principal places of business in California. Subject matter jurisdiction is based upon diversity of citizenship. LM's amended complaint alleges, among other things, that all corporate defendants are alter egos and thus liable for any judgment or liability imposed on SOG.

## STANDARD OF REVIEW

Federal courts may exercise personal jurisdiction over nonresident defendants in diversity cases only if a forum-state court would have such jurisdiction. *Hyatt Int'l Corp. v. Coco*, 302 F.3d 707, 713 (7th Cir.2002). Illinois courts can "'exercise jurisdiction on any ... basis now or hereafter permitted by the Illinois Constitution and the Constitution of the United States.'" *Id.* at 714 (quoting 735 ILL. COMP. STAT. 5/2-209(c)). The state and federal jurisdiction standards are not meaningfully different. The exercise of jurisdiction comports with the Illinois Constitution if "it is fair, just, and reasonable to require a nonresident defendant to defend an action in Illinois, considering the quality of and nature of the defendant's acts which occur in Illinois or which affect interests located in Illinois." *Rollins v. Ellwood*, 141 Ill.2d 244, 152 Ill.Dec. 384, 565 N.E.2d 1302, 1316 (Ill.1990). The exercise of jurisdiction comports with the Federal

Constitution if the non-resident defendant has "purposefully avail[ed][him]self of the privilege of conducting activities" in the forum state such that he "should reasonably anticipate being haled into court there." *Burger King v. Rudzewicz,* 471 U.S. 462, 474, 475, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1980) (citation omitted).

Once the defendant moves to dismiss the complaint for lack of personal jurisdiction, the plaintiff bears the burden of demonstrating jurisdiction. *Purdue Research Foundation v. Sanofi-Synthelabo,* 338 F. 3d 773 (7th Cir. 2003). When the defendant moves to dismiss based on the submission of written materials, without an evidentiary hearing, the plaintiff need only make out a *prima facie* case of personal jurisdiction. *Hyatt Intern. Corp. v. Coco,* 302 F.3d 707, 713 (7th Cir. 2002). The plaintiff is entitled to resolution in its favor of all disputes concerning relevant facts presented in the record. *Purdue Research,* supra, 338 F.3d at 782.

FACTUAL BACKGROUND

SOG is a professional employee organization ("PEO") which provides various services to companies that desire to outsource their human relations, payroll, and related activities, including the placement, administration and servicing of workers' compensation insurance. Here, only the workers' compensation activity is implicated. Several of SOG's clients are professional athletic teams and leagues involved in contact sports, and because

3

their activities tend to generate injuries to players, it is difficult, if not impossible, for such organizations to obtain workers' compensation coverage in the open market. Prior to the events that gave rise to this suit, SOG had entered into client service agreements with two minor league ice hockey teams based in Illinois and provided workers' compensation insurance covering potential claims by their players through the Illinois Assigned Risk Plan. LM issued its policy #WC5-34S-351417-012 (the "First Policy") to SOG for that purpose. The First Policy was written to cover claims arising from November 16, 2002 through November 16, 2003. SOG has not challenged personal jurisdiction and could not successfully do so.

In early 2003, SOG entered into a contractual relationship with Arena Football 2 Operating Company ("AF 2"), which is also located in Illinois, to obtain workers' compensation coverage for AF 2's football players. In March of 2003, SOG represented to AF 2 that it had obtained such coverage from LM by endorsement of the First Policy, and instructed AF 2 as to what its premium payments would be required and where to send them. That same month, SOG's insurance broker, AIA/Merriman ("AIA") issued a certificate of insurance attesting to the existence of the coverage. The representations were incorrect and, according to LM, may have been made by SOG with knowledge of their falsity. The complaint alleges both fraud and negligent misrepresentation, claiming that LM was

not informed of the transaction and that LM did not endorse the First Policy to provide coverage to AF 2 until early September. In any event, between March and July of 2003, AF 2 made "premium payments" to AIA and SOG totaling just under $710,000.00, which were never transmitted to LM.

LM alleges that in August of 2003, it re-estimated the premium to be $1,929,342.50 and obtained a binding agreement from SOG to pay the re-estimated premium and from Brian Bonar, CEO of SOG to personally guarantee payment of $829,342.50 of the total. AF 2 was to pay $1.1 million of the re-estimated premium to SOG. On August 13, 2003, Bonar, who in addition to being CEO of SOG was a vice president of Expert HR, and David Stone, who was legal counsel to both companies, met in Illinois with representatives of AF 2. Mr. Bonar stated at the meeting that SOG's parent company had used money received from AF 2 as premium payments to finance the parent's own internal operations. On August 28, 2003, a written agreement was signed by Bonar, SOG, and LM incorporating the undertakings of the of the parties as set forth above. On September 3, 2003, $1.1 million was wired to LM (presumably by AF 2, although the parties do not specifically so state), and on September 4, 2003, LM reissued the First Policy as Policy #WC5-34SD-351417-022 (the "Second Policy"). The Second Policy is the same as the First Policy, except that by endorsement it covers the AF 2 employees. Later that month, Bonar claimed that the

endorsement was unauthorized and that he was not bound by his written guarantee because LM had changed the terms. LM has paid claims on the Second Policy. In the amended complaint, LM estimates that SOG is indebted to it in the sum of $2,453,732.00 plus costs. LM alleges that it cannot presently provide the exact amount of the indebtedness, because SOG refuses to comply with the audit requirements of the policies. The substantive allegations expressly directed to the Expert HR Entities appear in Counts VI (unjust enrichment), Count VII (negligent misrepresentation), Count VIII (negligent omissions), and Count XIII (alter ego).

## THE RECORD

The present motion is based upon an affidavit of Thomas Beener. Mr. Beener alleges that: he has served as CEO of both Expert HR Entities since January 2003; that those entities have not done any business in Illinois, are not located in Illinois; and not do not have assets, offices, real estate, clients, or employees in Illinois. Beener further alleges that *authorized* agents of the Expert HR Entities had not traveled to Illinois to do business or to look for clients, and that they had not made any contracts or promises with (sic) the State of Illinois; that AF 2 was a client of SOG and was never a client of the Expert HR Entities, and that the same held true for the minor league hockey teams referred to above; and that the Expert HR Entities *have* no relationship with SOG. (emphasis added). His allegations are brief and conclusory.

He does not directly address the question of common ownership or control.

LM's evidentiary response to the motion consists of documents obtained during discovery[1]. The documents indicate that Expert HR, operating from its offices outside Illinois, assisted SOG in obtaining workers' compensation coverage in Illinois for the Illinois-based sports organizations that were its clients during the year 2003. In support of its alter ego theory, LM points to a letter dated January 2, 2003 sent to Thilman & Filippini ("T&F"), a Chicago insurance agent for The Georgia Force, an SOG client, as well as for AF 2. The January 2, 2003 letter provided details with respect to a pending application for workers' compensation insurance, which LM represents resulted in the issuance by LM of the First Policy. The letter was written by David L. Stone, on behalf of Expert HR, and signed by him as corporate counsel. In his letter, Mr. Stone states that Expert HR is a wholly owned subsidiary of The Greenland Corporation and goes to state that

> Expert HR currently maintains two separate operating companies, Source One Group and EnStructure. Expert HR and its related companies currently provide services to approximately 63 client companies and approximately 3000 contracted worksite employees. Expert HR maintains offices in San Diego, CA, Troy, MI, Richmond, VA, and Scottsdale, AZ.

---

[1] SOG does not challenge the authenticity or competency of the documents relied on by LM, except as to one assertion in the deposition of Joseph M. Vrankin.

The January 2, 2003 Stone letter was accompanied by copies of a proposed Client Service Agreement and Proposal of Service.

Other documents submitted by LM also show that in 2003, Expert HR and SOG were closely related. Expert HR was, and apparently still is, a wholly owned subsidiary of The Greenland Corporation ("Greenland"), and SOG was a subsidiary of ITEC (now called Dalrada). In late 2002 or early 2003, ITEC acquired an 80 percent ownership interest in Greenland. In 2003, Beener was the CEO of Greenland, and Bonar was CEO of ITEC. In that same year, Bonar was a vice president of Expert HR, and Beener was corporate secretary of SOG, while David Stone was legal counsel to both Expert HR and SOG. And while it is not clear which entity paid the salary of sales executive David Valade, Mr. Valade was involved in the procurement and servicing of AF 2's workers' compensation coverage. Valade and Stone both used Expert HR's email address as their own. Postal addresses given for Expert HR and SOG in San Diego and Troy Michigan were also the same. Much of this information is taken from a document dated August 19, 2003 which describes "The Expert HR Management Team" and gives biographical information. Bonar, Beener, Stone and Valade are alleged by LM to have controlled both SOG and Expert HR in 2003. Joseph Vrankin, the CFO of AF 2, whose deposition was taken in this action by LM's counsel, testified that he regarded SOG and Expert HR as

8

"interchangeable."[2] Other documents submitted by LM show, among other things, that: (1) when advising Bonar, Stone wrote on the letterhead of Expert HR ; (2) an outside broker who was resigning from all brokerage handled on behalf of Expert HR and SOG wrote to Bonar at the address of Expert HR in San Diego; (3) the March 18, 2003 letter with which Arena Football League transmitted the signed originals of the AFL and AF 2 Service Agreements was addressed to Stone at "Expert HR/ Source One Group in Troy, Michigan; (4) Arena Football also addressed communications to David Valade at Expert HR's Troy, Michigan address; (5) Stone used SOG letterhead when writing to LM on July 25, 2003; (6) Stone counter-signed a letter from Arena Football League dated August 8, 2003 on behalf of "Source One Group, Inc./Expert HR" (the letter dealt with the proposed issuance of the Second Policy); and (7) Thomas Beener is shown on an LM exclusion form relating to the Second Policy as Secretary of SOG.

On June 23, 2005, LM and Expert HR jointly filed a motion to supplement the record with a recently discovered document, stating that they had learned the previous day that Expert HR was registered with the State of Illinois as an employee leasing company. The application for the registration (dated October 19,

---

[2] Expert HR objects to this characterization as a conclusion. I find the statement relevant, admissible and corroborative of the alter ego nature of the relationship between the corporate defendants.

9

2003 and submitted jointly herein by the parties) was signed by Beener as Expert HR's CEO.

## DISCUSSION

For purposes of my analysis, I do not rely solely on Expert HR's registration as a PEO with the Illinois Department of Insurance. Such status might well be construed as conclusively showing that Expert HR purposely sought to avail itself of the privilege of conducting activities in the forum state such that it should reasonably anticipate being haled into court here. However, I note that the application for the registration was not filed until October 19, 2003, two months after SOG repudiated the Second Policy as "unauthorized." The parties have not provided me with any citation of authority or argument for the proposition that the registration has the effect of conferring jurisdiction on an Illinois court with respect to claims arising out of events that preceded registration. Nor am I aware of any such authority.

The alter ego argument also presents difficulty. I must keep in mind that whatever the relationship of the defendants, the contract that was discussed at the August 13, 2003 meeting in Illinois was nominally one between AF 2 and SOG, not between AF 2 and Expert HR, even though Stone acted from time to time on behalf of either or both defendants and was corporate counsel to both, while Bonar, himself a corporate officer of Expert HR, was nominally present as CEO of SOG. Usually, the alter ego rule is

10

applied to pierce the corporate veil of a corporate entity and impose liability on its stockholder or stockholders when it has been shown that the corporation is so totally controlled by the parent or stockholders that in equity its separate legal existence should not be recognized and its actions should be imputed to the parent or stockholders so that they may be haled into court in the forum state. Here, SOG is not a subsidiary of Expert HR. Rather, LM argues that a small group of individuals so controlled the activities of both Expert HR and SOG that they must be treated as alter egos and the acts of their representatives attributed to both entities. I find some logic in this argument. True, SOG was the subsidiary of ITEC/Dalrada., while Expert HR was the subsidiary of Greenland. But Greenland was controlled by ITEC/Dalrada, and Bonar was the CEO of ITEC/Dalrada and thus in a position to highly influence if not control the activities of ITEC/Dalrada's grandchild subsidiary, Expert HR. At least one Seventh Circuit decision supports the proposition that where the controlling stockholder and CEO of a foreign corporation personally conducts business in Illinois, that is a sufficient basis for both special jurisdiction under the Illinois longarm statute, 735 ILCS 5/2-209 and meeting the minimum contacts requirement of the Due Process clause of the federal constitution. *See Deluxe Ice Cream Co. v. R.C.H. Tool Corp.*, 726 F. 2d 1209 (7th Cir. 1984).

Moreover, I am constrained by the rule of *Purdue Research Foundation v. Sanofi-Synthelabo*, 338 F. 3d 773 (7th Cir. 2003), to resolve factual disputes in favor of the plaintiff. I therefore deny the motion to dismiss of the Expert HR Entities, without prejudice, however, to considering the issue again by motion either at the close of discovery or at the close of plaintiff's evidence at trial.

**ENTER ORDER:**

*[signature]*

**Elaine E. Bucklo**
United States District Judge

DATED: July 29, 2005