**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **LM INSURANCE CORPORATION** | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   No. 04 C 618 |
| | ) |
| **SOURCEONE GROUP, INC., a/k/a and** | ) |
| **d/b/a SOURCE ONE GROUP, LLC, and** | ) |
| **PAYROLL SERVICES OF VIRGINIA;** | ) |
| **DALRADA FINANCIAL CORPORATION, a/k/a** | ) |
| **and d/b/a IMAGING TECHNOLOGIES** | ) |
| **CORPORATION; EXPERT HR, INC., and** | ) |
| **EXPERT HR-MICHIGAN, INC.,** | ) |
| | ) |
| Defendants. | ) |
| | ) |

## MEMORANDUM OPINION AND ORDER

Before this Court are three cross-motions for summary judgment filed by plaintiff LM Insurance Corporation ("LM"), defendants Expert HR, Inc. ("Expert HR") and Expert HR-Michigan, Inc. ("Expert HR-Michigan") (collectively the "Expert HR defendants"), and defendants SourceOne Group, Inc. ("SOG") and Dalrada Financial Corporation ("Dalrada") (collectively "SOG/Dalrada").

LM's 13-count amended complaint includes claims for breach of contract against SOG (Count I), statutory recovery of interest against SOG (Count II), equitable action for specific performance against SOG (Count III), promissory estoppel against SOG (Count IV), unjust enrichment against SOG, Dalrada and the Expert HR defendants (Counts V and VI), negligent misrepresentation and negligent omission against SOG and the Expert HR defendants (Counts

VII and VIII), fraud and fraudulent inducement against SOG (Counts IX and X), conversion and constructive trust against SOG (Counts XI and XII), and an "alter ego" claim against SOG, Dalrada and the Expert HR defendants (Count XIII).

LM has moved for partial summary judgment on the breach of contract, promissory estoppel, unjust enrichment, negligent misrepresentation/omission, fraud, conversion, and alter ego claims against them. SOG and Dalrada have jointly filed a motion for summary judgment as to all of plaintiff's claims. The Expert HR defendants have also filed a motion for summary judgment contending that this court lacks personal jurisdiction over them. For the reasons set forth below, I grant the Expert HR defendants' motion for summary judgment. I grant SOG/Dalrada's motion for summary judgment as to all claims against Dalrada and as to LM's promissory estoppel, fraud, unjust enrichment, conversion, and constructive trust claims against SOG. I deny SOG/Dalrada's motion for summary judgment as to the remaining claims, and deny LM's motion for summary judgment in its entirety.

I.

Summary judgment is appropriate where the record shows that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Lexington Ins. Co. v. Rugg & Knopp*, 165 F.3d 1087, 1090 (7th Cir. 1999); Fed. R. Civ. P. 56(c). I must construe all facts in the light most

2

favorable to the non-moving party and draw all reasonable and justifiable inferences in favor of that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## II.

The parties' motions and supporting papers, including each party's Local Rule 56.1 statement of material facts, demonstrate that the parties fundamentally disagree about many of the facts and issues in the case. The parties spend a significant portion of their briefs contesting what occurred rather than analyzing the relevant legal standards.[1] From these pleadings and statements, however, the following set of facts emerge: SOG was a subsidiary of Dalrada, and Brian Bonar ("Bonar") was the CEO of both entities. SOG is a professional employer organization (a "PEO"). PEOs typically provide human resources–related services to their client companies including benefits and payroll administration and insurance. PEOs provide these services by "co-employing" personnel

---

[1]This is particularly problematic given that many of plaintiff's arguments rely upon its interpretation of what Illinois workers' compensation law requires, and on the supposed "illegality" of the terms for which SOG argues it was negotiating. Plaintiff never provides any legal citations for its contentions. As such, plaintiff has waived any arguments concerning the illegality of the terms for which SOG claims it was negotiating. *Pelfresne v. Vill. of Williams Bay*, 917 F.2d 1017, 1023 (7th Cir. 1991) ("A litigant who fails to press a point by supporting it with pertinent authority, or by showing why it is sound despite a lack of supporting authority or in the face of contrary authority, forfeits the point. . . . We will not do his research for him.").

for their clients to provide services at a favorable cost, and then "leasing" personnel back to their clients.

Companies in Illinois are required to provide workers' compensation to their employees. *See generally* 820 Ill. Comp. Stat. Ann. 305/1 *et seq.* (2006). Companies typically meet this obligation through workers' compensation insurance. Companies that cannot independently obtain coverage may apply to the Illinois Workers' Compensation Insurance Assigned Risk Plan ("Assigned Risk Plan") which assigns those companies an insurer from the risk pool. See 50 Ill. Admin. Code tit. 50 § 2904.60 (2006) (providing mechanism for obtaining insurance through the risk pool). All insurance companies licensed to provide workers' compensation insurance in Illinois must participate in the risk pool. 215 Ill. Comp. Stat. Ann. 5/468.

In November of 2002, SOG applied for coverage to the Assigned Risk Plan seeking workers' compensation coverage for two clients, both minor league sports franchises based in Illinois. The Assigned Risk Plan assigned the coverage to LM, and LM subsequently issued policy WC5-34S35147-012 (the "First LM Policy") to SOG. This policy was effective for exactly a year from November 16, 2002 to November 16, 2003, and listed SOG as the insured. It includes two "Illinois Employee Leasing Endorsements" providing coverage to SOG for any employees it leased to the two franchises. It also

4

eventually endorsed a Georgia franchise onto the policy as well, with coverage for that team effective January 15, 2003.[2]

The "Producer of Record" (i.e., the insurance broker) listed on the First LM Policy was Dupre Insurance Services ("Dupre"). Shortly after the policy was issued in late 2002 or early 2003, SOG decided to change to a new broker, AIA Merriman (the parties dispute the reasons for this change). AIA Merriman then applied to the Assigned Risk Plan for new coverage for SOG and employees it leased to the franchises endorsed onto the First LM Policy.[3] The Assigned Risk Plan assigned Travelers Indemnity Company ("Travelers") to this coverage, and Travelers then issued policy number 6KUB-7326A25-0-03 (the "Travelers Policy") for coverage effective March 1, 2003 through March 1, 2004.[4] This policy listed "Source One Group" as an insured, a slightly different name for the insured on the First LM Policy. The First LM Policy was not cancelled at this time, so both the First LM Policy and the

---

[2]The First LM Policy covers accidents which occur during the policy period, and diseases to which the worker is exposed during the policy period; notice of those claims and subsequent payments by the insured could conceivably occur after the expiration of the policy period.

[3]This appears to have been part of an attempt by AIA Merriman to replace Dupre as the agent of record for SOG's Illinois workers' compensation coverage.

[4]Like the First LM Policy, the Travelers Policy is also occurrence/exposure based, so that Travelers might have the obligation to pay claims after the end date of the coverage.

5

Travelers Policy concurrently provided coverage to an SOG entity and the employees covered by the endorsement.[5]

Unlike other types of insurance policies, the First LM and Travelers Policies only list an "estimated" premium. Neither of these policies specify a set premium that SOG must pay, but rather provide a general estimate of the premium and the methodology for calculating it and bind SOG to pay that final premium, whatever the amount. The final premiums due on these policies depend on four factors. First, the policies identify covered employees by code. Each type of covered employee has a specific premium rate associated with it (the rates for contact sports franchises are substantially higher than those for office workers, for instance, since the rate and severity of injuries for athletes are greater). The rates are determined by applying the premium rate for a particular class of employees to the total amount of payroll for those employees. For this reason, these policies contain provisions requiring the insured to submit information concerning its payroll to the insurer, and allowing the insurer to conduct an audit of the insured to verify the accuracy of this information.

Second, these policies are subject to an "experience modification." This is a multiplier applied to the final payroll

---

[5]The parties dispute whether SOG intended to cancel the First LM Policy at this time (indeed, there is conflicting correspondence and deposition testimony on this point) but the parties do not dispute that around the time the Travelers Policy was issued, SOG asked LM to cancel the First LM Policy.

6

amount that is intended to adjust the premium for insureds who, based on various factors, are more or less likely to have claims.

Third, both policies contain a Loss Sensitive Rating Plan ("LSRP") endorsement. The LSRP endorsement for both policies provide that the LSRP provision is triggered if the premiums for the policy equal or exceed a particular amount. If this occurs, premiums for the policy are adjusted based on the losses incurred during the policy period. If there is a premium decrease during the first 120 days of coverage that drops the policy below the LSRP threshold, then the policy is converted into a guaranteed cost policy for which premiums are not adjusted based on losses incurred. An insured cannot avoid the application of the LSRP through misrepresentation or omission of information, however (such as by withholding information that would affect the premium amount); the endorsement provides that attempts to avoid the LSRP result in "the pro rata application of LSRP from the date upon which it would have applied had such misrepresentation or omission not been made."

Fourth, because premium rates are determined by statute, the actual premium rates may vary. Premium rates may also vary depending on the circumstances under which the policy was cancelled. Final premium rates are not determined until the policy period ends and the insurer can determine what rates apply.

In March of 2003, SOG entered into a Client Service Agreement ("CSA") with Arena Football 2 Operating Company, LLC ("AF2") to provide AF2 with certain human resources services. Paragraph 6.1 of the CSA requires SOG to "secure workers' compensation Insurance for the Worksite Employees in amounts determined by [SOG] as appropriate and required by law and as set forth in the attached Proposal for Services."[6]

On April 4, 2003, AIA Merriman applied to Travelers to add AF2 as an "alternate employer" under the Travelers Policy. On April 11, 2003, Travelers issued an "Illinois Employee Leasing Endorsement" providing coverage to "Source One Group" under the Travelers Policy for any employees it leased to AF2.[7] It is undisputed that the endorsement request sent to Travelers states an AF2 payroll that is significantly lower than AF2's actual payroll. The parties agree that this number was provided to Travelers via

---

[6]One undisputed fact is that, prior to making its first payment to SOG under the CSA, AF2 asked SOG to confirm that SOG had obtained insurance coverage. On March 18, 2003, AIA Merriman gave AF2 a certificate of insurance purporting to show that AF2 was endorsed onto the First LM Policy. On April 3, 2003, AIA Merriman sent AF2 a different certificate purporting to show that AF2 was endorsed onto the Travelers Policy. The parties agree that the first certificate of insurance was sent in error. In addition, it is undisputed that AF2 wired payments under the CSA totaling over $700,000 to SOG, Dalrada and/or SOG's insurance broker, and that no portion of these payments went to pay premiums for workers' compensation coverage for AF2.

[7]The record is unclear whether this endorsement began providing coverage on April 11 or was retroactive to some earlier date.

8

AIA Merriman but dispute how and why this number was given, and whether SOG intentionally or knowingly provided this number.[8]

Around the end of March of 2003, the administrator for the Assigned Risk Plan became aware of the existence of both the First LM Policy and the Travelers Policy. Per the rules of the Assigned Risk Plan, an insured cannot have the same workers' compensation risk assigned to two different insurers.[9] For this reason, on May 27, 2003, the administrator sent a letter to Travelers instructing Travelers to cancel the Travelers Policy, to "allow [LM] to maintain [the First LM Policy] in effect" and to transfer any claims made on the Travelers Policy to LM. It appears that at this time the administrator believed that the Travelers Policy and the First LM Policy insured substantially similar risks. The Travelers Policy was subsequently cancelled.

The parties dispute what happened next, but it appears that workers' compensation claims formerly submitted to Travelers were sent to LM for processing under the First LM Policy. LM took the position that the policy did not cover AF2 since AF2 was not listed as a covered employer under the policy. Although SOG may have

[8]It is not clear, and the parties do not address, whether SOG paid premiums to Travelers.

[9]Despite the difference in the name of the insured on the two policies, the Assigned Risk Plan apparently treated them as the same entity, perhaps because SOG communicated its intention for the entities to be treated as identical.

9

initially maintained that the Assigned Risk Plan administrator's actions automatically conferred coverage to AF2 under the First LM Policy, SOG and LM began negotiations to add an endorsement to the First LM Policy to cover AF2's employees (the "AF2 endorsement"). Around July 25, 2003, David Stone ("Stone") (legal counsel for SOG) signed and sent a "Letter of Agreement" (the "July Letter") to Neil Johnson ("Johnson") of LM which stated:

> Pursuant to our telephone conversation of July 21, 2003, this correspondence shall serve as a Letter of Agreement between [LM] and your insured, [SOG], as follows: Under the [AF2] endorsement to the SOG policy, Illinois rates shall apply as of the date of the endorsement, March 10, 2003, with an effective modification rate of 2.41. . . . Finally, it is our understanding that the foregoing only applies to the current policy. Upon renewal, any teams located in states outside of Illinois will require separate coverage consistent with NCCI requirements.

Other testimony and internal LM documents appear to show that Johnson believed that Stone had orally agreed that, in exchange for the AF2 endorsement, SOG would first send LM a check for approximately $1.6 million which represented the estimated additional premium Stone believed SOG would owe for the endorsement. Johnson testified that although he signed this agreement upon its receipt, he did not return it to SOG until after August 28 because he did not want to agree to provide an endorsement until he had received SOG's payment.

10

After Stone sent the July Letter, the parties engaged in additional negotiations concerning AF2's actual payroll, upon which premium rates depended. SOG provided updated payroll information to LM which raised the estimated premium to roughly $1.9 million. On August 8, 2003, Johnson sent Stone an email in which Johnson stated, "In accordance with the Plan rules, we will endorse coverage for AF2 upon receipt of $1,929,342.50."[10]

Johnson and Bonar continued negotiating with respect to premium payments. At one point, Johnson orally requested that SOG make a downpayment of $300,000 and Bonar provide a personal guarantee for the remaining amount of the premium. Bonar did not agree to these payment terms. Around the same time, Johnson also spoke separately with representatives of AF2 concerning the payment of premiums.[11]

---

[10]LM refers to this email in its pleadings as the "Second Letter Agreement." This characterization is unwarranted given that there is no indication that SOG "agreed" to anything with respect to this email or the offer it reflects. It appears to merely clarify that LM will provide an endorsement upon payment of the estimated premium. This is better characterized as an offer.

[11]Although not directly related to the merits of LM's claims, it appears that AF2 became concerned with the pace of negotiations concerning its insurance coverage. It had previously been represented to AF2 (either by SOG or by SOG's insurance broker) that AF2 was covered under the First LM Policy, but AF2 later determined that this was not the case. AF2 had made some payments to SOG pursuant to the CSA; the parties dispute whether these funds were for insurance premiums or to reimburse SOG for its services. In addition, SOG contended it could not afford to pay LM directly for AF2's coverage. It appears that the parties determined that AF2 would make some payments directly to LM. AF2 appears to have negotiated with LM either directly or through a claim management

11

On August 28, 2003, Bonar sent Johnson a signed letter (the "August Letter") in which Bonar purported to "confirm an understanding" between SOG and LM and to "supplement the terms and conditions of the policy and agreement reached between SOG and [LM] on or about July 25, 2003." The letter appears to set out a payment schedule to provide $1,929,342.50 to LM in exchange for the AF2 endorsement. The letter also provided that "Liberty shall receive an initial payment of $1,100,000" and the remaining amount in three future payments. Upon receipt of the $1.1 million initial payment, the letter specified that LM "shall immediately endorse the insurance policy referenced herein with [AF2] as a client of SOG and process all claims in the appropriate jurisdiction." The letter further stated that the additional amount beyond the $1.1 million payment was guaranteed by both SOG and Bonar.

Upon receipt of the August Letter, the parties agree that Johnson made some handwritten edits to his copy of the letter, changing and adding certain language and initialing each of his changes. The original letter stated that Liberty had agreed to issue a "workers' compensation insurance policy" to provide

provider concerning the payment terms for the AF2 endorsement. It is undisputed that Bonar and other SOG representatives made numerous representations to AF2 that it was obtaining workers' compensation insurance for AF2. AF2 may have interpreted these conversations to mean that Bonar was obtaining coverage through LM, and may have conveyed this understanding to LM.

coverage to AF2; Johnson changed the word "policy" to read "endorsement." The original letter stated that "the total premium" on the policy was approximately $1.9 million; Johnson changed the word "total" to "estimated." Finally, Johnson added language in a sentence stating that SOG and Bonar both guaranteed the remaining payments to read that SOG and Bonar guaranteed the payments "jointly and severally." Johnson signed his version of the letter and sent it to a representative of AF2 and a representative of SOG's claim management provider.[12] He also left Bonar a voicemail informing him of these changes and told Bonar that he would sign a re-typed version of the agreement incorporating his changes.

On September 3, AF2 wired a $1.1 million payment to LM. Bonar knew of this payment. The next day, LM cancelled the First Policy and "reissued" a second policy with the number WC5-34S-351417-022 (the "Second LM Policy").[13] LM characterizes this policy as a "rewrite" of the First LM Policy, done because its internal

---

[12]Neither party addresses how Bonar or anyone else at SOG received a copy of Johnson's changes to the August Letter. Bonar was orally informed of the changes via voicemail, and Stone appears to have eventually received a copy of the letter.

[13]It is also unclear from the record whether Bonar or any other representatives of SOG were aware of the cancellation of the First LM Policy or the issuance of the Second LM Policy. The parties agree that no one from SOG was copied on a series of emails sent between LM and AF2 concerning the payment of the $1.1 million and the subsequent processing of claims. Stone testified, however, that around the beginning of September it was his understanding that AF2 was being added to the First LM Policy and that LM was paying AF2 claims.

administrative system did not allow LM to issue the AF2 endorsement to the existing First LM Policy. Both policies provided coverage from November 16, 2002 through November 16, 2003. The Second LM Policy was different, however, because it contained an endorsement adding AF2 as a covered employer retroactive March 10, 2003. Dalrada/SOG also contend that the Second Policy differed from the first because the LSRP provision, discussed above, applied to the AF2 endorsement. The First LM Policy also contained an identical LSRP endorsement but the parties disagree whether this provision would have applied to the AF2 endorsement had it been added to that policy. SOG/Dalrada contend that it would not have applied since AF2 was not added to the policy until after the policy had been in place for 120 days. LM argues that SOG had a duty to report its CSA with AF2 during the first 120 days of the First LM Policy, and that by not doing so it avoided the application of the LSRP. Under the terms of the policy, this omission would have resulted in the pro rata application of the LSRP to the AF2 coverage. It is unclear, however, whether the parties discussed, and SOG contemplated, that the LSRP would apply to the AF2 endorsement.

On September 4, LM began paying on AF2 claims. That same day, SOG's Stone had a telephone conversation with Johnson in which he confirmed that AF2 had made the preliminary $1.1 million payment. Stone then confirmed he had received a copy of the August Letter with Johnson's changes.

14

Stone sent a letter to Johnson the same day saying:

> Pursuant to our telephone conversation of today, this correspondence shall confirm that Brian Bonar is in receipt of your changes to the August 28, 2003 letter concerning workers' compensation coverage to AF2. Upon review and consideration, the revised document will be forwarded to your attention for execution.

On September 10, SOG sent correspondence to AF2 informing AF2 that SOG had obtained separate workers' compensation coverage for it through a tribal coverage plan, and requested AF2 make a wire transfer of its purported premium obligation to a bank. The record is not clear whether LM was aware of this correspondence or the placement of the separate coverage.

It appears that through the summer and fall of 2003, LM had made attempts to conduct an audit under the First (and later the Second) LM Policies. LM and SOG agree that after July 2003, no audit of SOG's payroll occurred. On September 28, LM advised SOG that the Second LM Policy was cancelled due to SOG's failure to cooperate with LM's audit of the payroll covered by the Second Policy. LM continued to seek SOG's cooperation to conduct an audit under the Second LM Policy to determine the final premium, but no audit occurred.

Two days later, the date that the first payment from SOG would have been due under the terms of the August Letter, Bonar sent a letter to LM's Johnson which purported to provide "formal notice to

15

cancel the unauthorized endorsement of [AF2] to [SOG]'s policy of workers' compensation coverage." This litigation commenced thereafter.

Plaintiffs have also alleged that the Expert HR defendants were involved in the wrongdoings described in their complaint, both through their employees who purportedly acted in Expert HR's name, and as an "alter-ego" of SOG and Dalrada. During the relevant time in this litigation (but not currently), the Expert HR defendants were wholly-owned subsidiaries of Greenland Corporation ("Greenland"), which in turn was substantially owned by Dalrada. Bonar was the Chairman of the Board of Directors of Greenland. The Expert HR defendants shared office space in Michigan and other locations with SOG, and shared some employees. The Expert HR defendants were also in the PEO business. Plaintiffs allege that both Bonar and Stone and other individuals represented to LM and AF2 that they acted on behalf of the Expert HR defendants, although LM acknowledges that Thomas Beener ("Beener"), president of Expert HR, did not authorize this representation. Some correspondence with AF2, LM and others was sent on Expert HR letterhead. Some letters sent by Stone were sent on SOG letterhead but contained an Expert HR "fax signature" (appearing as though they were sent from an Expert HR fax machine). In addition, a check for $200,000 was

issued from an Expert HR account and sent to SOG's insurance broker to purportedly cover premium payments for the First LM Policy. Thomas Beener discovered this check and immediately had it voided.

III.

I first address plaintiff's breach of contract claim. To be valid under Illinois law a contract requires an offer, acceptance, and consideration. *Voelker v. Porsche Cars N. Am.*, 353 F.3d 516, 528 (7th Cir. 2003). *See also Halloran v. Dickerson*, 287 Ill. App. 3d 857, 867-68, 679 N.E.2d 774, 782, 223 Ill. Dec. 323, 331 (Ill. App. Ct. 1997). In addition, there must be mutual assent, or a "meeting of the minds," as to the essential terms of the contract. *Acad. Chicago Publishers v. Cheever*, 144 Ill. 2d 24, 30, 578 N.E.2d 981, 984, 161 Ill. Dec. 335, 338 (1991). To find that SOG breached the contract with LM, I need to find that a valid contract existed to provide insurance coverage to AF2, and that there was a "meeting of the minds" about the contract's terms. These are all questions of law. "Under Illinois law, when the basic facts are not in dispute, the existence of a contract is a question of law." *Echo, Inc. v. Whitson Co.*, 121 F.3d 1099, 1102 (7th Cir. 1997). *See also Dresser, Indus. Inc. v. Pyrrhus AG*, 936 F.2d 921, 926 (7th Cir. 1991) ("'[I]ntent in contract law is objective rather than subjective' and, therefore, not a question of fact.") (quoting *Empro Mfg. Co. v. Ball-Co. Mfg., Inc.*, 870 F.2d 423, 425 (7th Cir. 1989)

17

In order to determine whether a valid contract existed, I first need to determine what kinds of evidence of a contract I can consider, and whether written evidence of such a contract must exist.

The Illinois Statute of Frauds states, in relevant part:

> No action shall be brought . . . upon any agreement that is not to be performed within the space of one year from the making thereof, unless the promise or agreement upon which such action shall be brought, or some memorandum or note thereof, shall be, in writing, and signed by the party to be charged therewith, or some other person thereunto by him lawfully authorized.

740 Ill. Comp. Stat. 80/1. If the plaintiff in this case has brought an action upon a contract that cannot be performed within one year from the making thereof, the Statute of Frauds would apply. *Hirtzer v. Avery Dennison Corp.*, 265 F. Supp. 2d 936, 938 (N.D. Ill. 2003) (Bucklo, J.).

The purported agreements made between the parties in this case were to modify the terms of the First LM Policy. The relevant time period to consider for the Statute of Frauds, then, is the time period of performance for that policy, and not for any collateral agreement into which the parties may have entered.[14] The First LM

_____

[14]*See, e.g., Nat'l Importing & Trading Co. v. E.A. Bear & Co.*, 324 Ill. 346, 355, 155 N.E. 343, 347 (1927) (finding that, where changes to an original contract must be in writing, any modifications to that contract must also be in writing). This may be a distinction without a difference, however, since the collateral agreements the parties were discussing concerned an endorsement that would run from March 10, 2003 to November 16,

Policy had a coverage period of exactly one year (not a year and a day as SOG/Dalrada argue) – 12:01 a.m. on November 16, 2002 until 12:01 a.m. on November 16, 2003.

It is possible for the First LM Policy to be completed within one year, since it is possible that the claims for which LM is obligated to pay will occur and be paid for within one year, and that the initial premiums SOG paid will be the only payments required under the policy. It is also possible that any audits LM requests under the policy could be completed within one year. Finally, although the LSRP provision of the Second LM Policy calls for several premium adjustment calculations at intervals after the completion of the policy, it is possible that losses might not occur after the expiration of the policy which would mean SOG would not be required to pay any additional premiums after the expiration of the policy. See Restatement (Second) of Contracts § 130, Comment (1981) ("A, an insurance company, orally promises to insure B's house against fire for five years, B promising to pay the premium therefor within the week. The contract is not within the Statute of Frauds, since if the house burns and the insurer pays within a year the contract will be fully performed."). For this

---

2003, with a final payment by SOG on November 30, 2003. This period would also keep the agreements outside the Statute of Frauds.

reason, the Statute of Frauds is not applicable to this contract and I may consider evidence of an oral contract.[15]

With this in mind, I turn to whether there is sufficient evidence that the requirements for a contract have been met. There is a genuine issue of material fact whether or not there was a legally-binding agreement between SOG and LM concerning the AF2 endorsement. Considering the facts as presented by the parties in this case, it is clear there was consideration. Consideration involves "some detriment to the offeror, some benefit to the offeree, or some bargained-for exchange between them." *Doyle v. Holy Cross Hosp.*, 186 Ill. 2d 104, 112, 237 Ill. Dec. 100, 105, 708 N.E.2d 1140, 1145 (1999). In this case, clearly the exchange of premium payments for payment of AF2 claims would constitute consideration.

Even including an assessment of oral evidence, there is a genuine issue of material fact whether there was acceptance. It is clear that SOG and LM were potentially interested in the AF2 endorsement. However, there is some evidence suggesting that the parties never agreed on the essential terms of such a deal, a

_____

[15]Both the First and Second LM Policies contain a provision under the General Section which provides that "[t]he only agreements relating to this insurance are stated in this policy. The terms of this policy may not be changed or waived except by endorsement issued by us to be part of this policy." This provision might potentially give the parties an argument under the parol evidence rule, but since neither party has addressed either this provision or potential parol evidence issues, I will not consider them here.

requirement for a finder of fact to conclude there was a meeting of the minds. The July Letter signed by both parties (albeit not sent back by Johnson until sometime in August) only affirmed that the parties were generally interested in adding an endorsement for AF2 onto the First LM Policy. The emails exchanged between Johnson and Stone on August 8 amounted to an offer by Johnson to endorse coverage upon payment of $1.9 million. The August 28 letter presented a schedule for those payments. Bonar signed the letter indicating he agreed to those terms. However, Johnson then made changes to the letter before signing and returning it. LM disputes that the handwritten changes he made were substantial, but two of these do appear to change the meaning of the agreement (the change from "policy" to "endorsement" is not substantial). As such, they created a counteroffer to which Bonar had to again agree. "A purported acceptance which changes the terms of the option or varies, alters or adds conditions to the offer constitutes a counteroffer rather than an acceptance." *Wentcher v. Busby*, 98 Ill. App.3d 775, 781, 53 Ill.Dec. 860, 864, 424 N.E.2d 651, 655 (Ill. App. Ct. 1981) (citations omitted). Bonar never affirmatively agreed to these new terms.

Further, there is the fact that the AF2 endorsement was placed on the Second LM Policy. There is a genuine issue of material fact whether SOG ever intended to have the First LM Policy "reissued" as the Second LM Policy. SOG argues that it never agreed to do so

21

because the Second LM Policy reactivated the LSRP provision of the First LM Policy. There is substantial evidence that SOG only contemplated the endorsement on the First LM Policy. In response, LM contends that the LSRP provision is legally required, and SOG could not have intended to enter into an "illegal contract." However, LM cites no law that a party's intent to enter into an "illegal contract" is somehow converted into an intent to enter into a legal one. In addition, it is possible that SOG wanted a provision that was illegal, and had it realized this, would not have agreed to the "legal" alternative. LM suggests that SOG knew the LSRP provision was required, and points to a letter sent by SOG to AF2 in which SOG purportedly admitted it was "obligated" to make additional payments under the Second LM Policy. Setting aside the fact that the purported admission in that letter is ambiguous at best, the letter was also clearly labeled a "PRIVILEGED AND CONFIDENTIAL SETTLEMENT COMMUNICATION" and as such is not admissible. Fed. R. Evid. 408. Plaintiff argues that SOG waived this privilege because both a defendant and AF2 produced the letter in discovery. However, the privilege is not AF2's to waive. Further, documents are frequently produced in discovery that are not admissible for certain purposes during a trial (and indeed, plaintiff provides no legal support for its position or factual evidence that the defendant waived its right to object) so I will not consider the contents of this letter at this time.

Plaintiff also argues that even if SOG never explicitly agreed to the terms of the revised August Letter, it manifested its assent by failing to take action after plaintiff accepted AF2's initial payment and began paying claims. In certain limited circumstances, acceptance may be evidenced by silence where an offeree accepts the benefit of offered services with opportunity to reject them and with the knowledge that they were offered with the expectation of compensation. See Restatement (Second) Contracts § 69; *Boomer v. AT&T Corp.*, 309 F.3d 404, 415 (7th Cir. 2002) (citing *Hill v. Gateway 2000, Inc.*, 105 F.3d 1147, 1148-49 (7th Cir. 1997)) (holding that, under Illinois law, silence can constitute acceptance under the terms of the Restatement of Contracts).

SOG was clearly aware, and does not dispute, that AF2 wired the first payment proposed in the August Letter to LM, and does not dispute that it knew that LM had begun paying claims to AF2. The same day that LM's Johnson told SOG's Stone that AF2 had wired the first payment to LM, Stone sent Johnson a letter stating that SOG's Bonar was in receipt of Stone's changes to the agreement and "upon review and consideration" would send the revised document to LM for execution. Despite being aware that LM was paying AF2's claims, SOG did not send the letter cancelling the AF2 endorsement for the better part of a month. Clearly, LM paid those claims with an expectation that SOG would pay the remaining premium amounts.

23

SOG makes two arguments in response. First, it argues that the August Letter as altered by Johnson would have made Bonar jointly and severally liable for SOG's obligation to LM. As such, it required Bonar's signature. While it is true under the Illinois Statute of Frauds that Bonar himself could not be held jointly and severably liable for SOG's obligations since he never signed the August Letter with Johnson's changes, 740 Ill. Comp. Stat. Ann. 80/1, this has no effect on whether SOG's silence may be treated as acceptance. Second, SOG contends that because it never agreed to have the AF2 endorsement added to the Second LM Policy (which consequently reintroduced the LSRP for that endorsement) its silence in the face of Johnson's changes to the August Letter could not have constituted acceptance. As I discussed above, there is a question of material fact whether SOG contemplated the application of the LSRP to the AF2 endorsement[16] and whether, as LM argues, SOG's actions caused the delay in endorsing AF2 onto the First LM Policy which should have triggered the application of the LSRP to the AF2-related claims anyway. These issues are for the ultimate factfinder to determine.

An additional ground for LM's breach of contract claim concerns SOG's purported failure to comply with the audit provisions in the policies. Both the First and Second LM Policies

[16]SOG's intent is a legal question for the court to determine, but there is a factual component to this question concerning SOG's understanding of the requirements and what was discussed in oral conversations about the endorsement.

contain an audit provision that states that the SOG must allow LM
to "examine and audit all your records that relate to this policy.
. . . We may conduct the audit during regular business hours during
the policy period and within three years after the policy period
ends." Both policies also require SOG to maintain records that LM
might need to compute premiums, and to provide LM with copies of
those records upon request. LM alleges in its statement of facts
that it tried multiple times between November of 2002 and September
2003, when LM cancelled the Second LM Policy, to schedule an audit
and to obtain records from SOG. SOG acknowledges that LM
attempted, without success, to schedule audits during that time but
contends that an audit did take place in August 2003, and further
argues that any audits scheduled under the Second LM Policy were
not required as SOG never agreed to the Second LM Policy.

Clearly, if SOG was bound to the First and Second LM Policies
and failed to comply with these audit and records provisions, SOG
breached its contract with LM. However, there is a genuine issue
of material fact whether SOG ever allowed an audit to go forward or
provided the appropriate records to LM. As discussed above, there
is also an issue of material fact whether SOG was bound to the
Second LM Policy, which is the Policy under which many of the
requests for audits and records were made. Therefore, summary
judgment on this aspect of LM's breach of contract claim would be
inappropriate at this time.

25

For these reasons, both SOG/Dalrada's and LM's motions for summary judgment as to the breach of contract count are denied.

IV.

LM also brought a promissory estoppel claim in the alternative to its breach of contract claim. Even if no contract was formed, it argues, it relied to its detriment on SOG's promise to reimburse LM for adding the AF2 endorsement to the First LM Policy. In response, SOG does not contest the specific arguments made by LM concerning its claim for promissory estoppel, but merely contends that Illinois does not allow promissory estoppel as a direct cause of action. SOG cites one case for this proposition, *DeWitt v. Fleming*, 357 Ill. App. 3d 571, 293 Ill. Dec. 446, 828 N.E.2d 756 (Ill. App. Ct. 2005). LM is correct, however, that as a federal court sitting in diversity this court is required to apply Illinois law as announced by the Illinois Supreme Court. *Republic Tobacco Co. v. N. Atl. Trading Co.*, 381 F.3d 717, 731 (7th Cir. 2004). Although Illinois appellate courts disagree whether promissory estoppel can be a direct cause of action, LM is correct that the Illinois Supreme Court's decision in *Quake Constr., Inc. v. American Airlines, Inc.*, 141 Ill.2d 281, 152 Ill. Dec. 308, 565 N.E.2d 990 (1990), still stands as the governing law in Illinois concerning promissory estoppel. *See, e.g., Ogdon v. Hoyt*, 409 F. Supp.2d 982, 989 n.4 (N.D. Ill. 2006) (Gettleman, J.) ("The

26

Illinois Supreme Court's decision in *Quake*, however, remains good law.").

Under the Court's decision in *Quake*, to establish its claim for promissory estoppel LM needs to prove: (1) defendants made an unambiguous promise to LM; (2) LM relied on that promise; (3) LM's reliance was expected and foreseeable by defendants; and (4) LM relied on the promise to its detriment. *Id.* at 309-10, 152 Ill. Dec. at 323, 565 N.E.2d at 1004. In addition, LM's reliance must be reasonable and justifiable. *Id.*

There are two problems with LM's promissory estoppel claim. First, as the Seventh Circuit recognized in *Dumas v. Infinity Broad. Corp.*, 416 F.3d 671 (7th Cir. 2005), promissory estoppel requires an unambiguous promise, and is a more rigorous standard than the standards for offer and acceptance under the law of contracts. *Id.* at 677-78 (citing *Quake Constr.*, 141 Ill.2d at 309-10, 152 Ill. Dec. at 323, 565 N.E.2d at 1004); *Phillips v. Britton*, 162 Ill. App. 3d 774, 785-86, 114 Ill. Dec. 537, 545, 516 N.E.2d 692, 700 (1987). Like LM's breach of contract claim, there is a real issue here about what promises the defendants made to LM, and based on the undisputed facts it is difficult to see how any promise SOG made was "unambiguous."

Second, the only difference between a claim for breach of contract and a claim for promissory estoppel is that promissory estoppel indicates a lack of consideration. *Dumas*, 416 F.3d at 678

27

("Illinois law requires that, but for consideration, all other elements of a contractual agreement exist in conjunction with such a claim."). *See also The Bank of Marion v. Robert 'Chick' Fritz, Inc.*, 57 Ill. 2d 120, 124, 311 N.E.2d 138, 140 (Ill. 1974) (noting that promissory estoppel "is usually considered as a substitute for consideration or an exception to its ordinary requirements"). For instance, promissory estoppel applies in a case in which a student, relying on a promise from an uncle that the uncle will pay for his college education if the student graduates, incurs educational debt only to find out on the eve of graduation that the uncle refuses to pay. In that situation, promissory estoppel would require the uncle to make good on his promise despite the fact that he received nothing from the student in return, because the student relied on his unambiguous promise to his detriment. See Restatement (Second) Contracts § 90. In this case, what LM argues is that SOG promised to pay LM only if LM conferred a benefit on it by endorsing AF2 onto SOG's insurance coverage and paying AF2's claims. Should LM be able to prove that SOG made a promise to make additional payments to LM (or implicitly made that promise by accepting a benefit in silence), LM would have no need of its promissory estoppel claim because consideration back to LM was clearly present in this case (LM covering AF2's claims). If LM cannot prove that SOG made such a promise, then LM has no claim for promissory estoppel. Lack of evidence of offer and acceptance cannot turn a

28

failed breach of contract claim into a successful claim for promissory estoppel. *Dumas*, 416 F.3d at 678. For this reason, I grant summary judgment to SOG on LM's claim for promissory estoppel.

V.

SOG attempts to dispose of the remaining claims against it by arguing that each requires proof that LM relied, to its detriment, on SOG's representations. SOG contends that LM can show no reliance in this case.

LM's claim for negligent misrepresentation requires LM to show (1) SOG made a false statement of material fact; (2) SOG was careless or negligent in ascertaining the truth of the statement, (3) SOG intended to induce LM to act, (4) LM took action in reliance on the truth of the statement, and (5) LM suffered damage as a result of its reliance; (6) when SOG had a duty to communicate accurate information. *See Liberty Mut. Ins. Co. v. Decking and Steel, Inc.*, 301 F. Supp.2d 830, 834 (N.D. Ill. 2004) (Bucklo, J.) (citing *Roe v. Jewish Children's Bureau of Chicago*, 339 Ill. App. 3d 119, 131, 274 Ill. Dec. 109, 120, 790 N.E.2d 882, 893 (Ill. App. Ct. 2003)).[17] There is no question that a company seeking insurance coverage has a duty to communicate accurate information to its

---

[17] A negligent omission claim is a type of negligent misrepresentation claim. *See Zurad v. Lehman Bros. Kuhn Loeb, Inc.*, 757 F.2d 129, 134-35 (7th Cir. 1985) (finding negligent misrepresentation claim satisfied where broker omitted information in selling stocks to customer).

potential insurer. *See Liberty Mut. Ins. Co.*, 301 F. Supp.2d at 835 (citing *New England Mut. Life Ins. Co. v. Bank of Ill.*, 994 F. Supp. 970, 976 (N.D. Ill. 1998) (Alesia, J.)).

Even assuming for a moment that SOG misrepresented the extent of the AF2 payroll in its negotiations with LM, the parties dispute whether LM relied on those misrepresentations and suffered damages as a result. LM claims that had it known the "true story" of SOG's conduct, it would not have issued the AF2 endorsement. SOG claims that LM knew many of the facts it claims were misrepresented by SOG through other sources, including AF2, the administrator of the Assigned Risk Plan and others. Even taking the facts in the light most favorable to LM, it is clear that many of the "misrepresentations" LM contends misled it were not necessarily misrepresentations upon which LM relied. First, at the time that SOG began negotiating with LM to add the AF2 endorsement, LM knew there were claims for coverage - the reason these issues initially arose within LM, as Johnson stated in his deposition, was that LM began receiving claims for such coverage outside of Illinois. Johnson also testified he was aware in June 2003 that there was an endorsement on the Travelers Policy providing coverage for AF2 employees. This was around the time that the Travelers Policy was

cancelled and SOG began speaking with LM about a potential AF2 endorsement.[18]

The main area of contention concerning information that SOG misrepresented or withheld from LM concerns AF2's exposures, the amount of the AF2 payroll, and SOG's negotiations and representations to AF2. Until SOG began negotiating for coverage with LM for AF2, it is difficult to see how SOG would have had a duty to inform LM about anything related to AF2. LM has also presented no credible argument (and cites no relevant precedent) to support the argument that SOG had an obligation to inform LM about the details of its CSA and negotiations with AF2. It is also hardly "negligent" of SOG to negotiate with LM for coverage only to decide that LM's final offer was not acceptable, and to decline to enter into a final agreement. In the *Liberty Mutual* case cited by plaintiff, the defendant insured made numerous directly false representations or omissions on his application for insurance. *Liberty Mut. Ins. Co.*, 301 F. Supp.2d at 835. Here, LM has not claimed that SOG made any misrepresentations to it concerning the

_____

[18]LM also appears to argue that it was a material misrepresentation for SOG not to inform LM about various issues relating to the duplicative coverage with Travelers. However, there can be no dispute that LM was aware that its own policy did not provide coverage for SOG – LM always took this position and required SOG to negotiate from scratch to have this endorsement added onto the policy. In any event, it is difficult to see how any of that information is "material" to the coverage with LM.

31

amount of the AF2 payroll or the activities in which AF2 was
involved – had it, this would be a material misrepresentation.[19]

   The most difficult misrepresentation to address concerns the
contention that AF2 and SOG did not have a co-employment
relationship.    The AF2 endorsement is an Illinois Leasing
Endorsement which means that, under the terms of the endorsement,
SOG must be leasing employees to AF2 in order for those employees
to be covered by the policy.  LM contends that SOG did not exercise
sufficient control over AF2 employees to be "leasing" them to AF2,
and had it known this, it would not have issued the AF2 endorsement
to SOG.  This type of misrepresentation does appear to be material.
However, taking the facts in the light most favorable to SOG, there
is a question about the exact nature of the control over AF2
employees by SOG (per the terms of the CSA), whether SOG was
negligent in not clarifying such information with LM, and whether
LM relied on such information.  Summary judgment as to this sole
misrepresentation/omission is not appropriate.   Because LM has
presented no evidence that the Expert HR defendants were involved

_____

   [19]Many of the misrepresentations and omissions related to AF2
about which LM complains relate to SOG's purported fraud on AF2.
Essentially, LM argues that had it known SOG was defrauding or
making misrepresentations to AF2, it would not have agreed to
endorse AF2 onto the policy.  While a party can be liable for
negligent omissions, SOG had no duty to inform LM about its
internal negotiations and communications with its client AF2.
While such information might be part of a general scheme to
defraud, and therefore might be part of LM's fraudulent inducement
claim, these omissions are not cognizable as a negligent omission
claim.

in this particular misrepresentation or omission, I grant summary
judgment for the Expert HR defendants as to these claims.

VI.

LM has also moved for summary judgment on its claim for fraud.
A claim for common-law fraud in Illinois requires a showing that
(1) a false statement of material fact was made; (2) the party
making the statement knew or believed it to be untrue; (3) the
party to whom the statement was made had a right to rely on it and
did so; (4) the statement was made for the purpose of inducing the
other party to act; and (5) the reliance by the person to whom the
statement was made led to his injury. *Redarowicz v. Ohlendorf*, 92
Ill. 2d 171, 185, 65 Ill. Dec. 411, 418, 441 N.E.2d 324, 331
(1982). An intentional omission of a material fact can also
constitute a false statement for purposes of meeting the test.
*See, e.g., Washington Courte Condominium Assoc.-Four v.
Washington-Golf Corp.*, 267 Ill. App. 3d 790, 815, 205 Ill. Dec.
248, 265, 643 N.E.2d 199, 216 (Ill. App. Ct. 1994). In its motion
for summary judgment, LM frames its fraud claims as a result of
SOG's conduct toward AF2. LM claims that SOG took money from AF2
that AF2 earmarked for premium payments and instead used that money
for "operating expenses." LM also claims that SOG tried to obtain
alternate workers' compensation coverage for AF2 through a "tribal
program" that did not meet SOG's obligations under the CSA because

33

it was not valid worker's compensation insurance in Illinois.[20]
SOG's cross-motion for summary judgment raises the valid question
of how these allegations show LM was defrauded by SOG.  Taking the
facts in the light most favorable to LM, as I must do for purposes
of evaluating SOG/Dalrada's motion for summary judgment on the
fraud claim, LM has failed to allege or argue that it somehow
"relied" on these statements or were harmed by them – if anyone was
harmed, it was AF2.  I grant summary judgment to SOG on LM's fraud
claim.

## VII.

LM also brings a claim for fraudulent inducement (also called
promissory fraud), the requirements of which are substantially
similar to those for a fraud claim.[21]  For a promise to be
actionable under a fraudulent inducement theory, the intention must
be to "induce the promisee to act for the promisor's benefit."
*U.S. ex rel. Ascher Bros. Co., Inc. v. Am. Home Assurance Co.*, 98
C 0995, 2003 WL 1338020, at *16 (N.D. Ill. March 18, 2003) (Lefkow,

---

[20]Whether or not this coverage was valid in Illinois is
disputed – indeed, LM has no direct proof of this but relies on the
unsupported opinion of a deponent.

[21]Fraudulent inducement requires (1) a false statement of
material fact by the defendant; (2) made with knowledge of its
falsity; (3) reasonably relied upon by the plaintiff; (4) made for
the purpose of causing the plaintiff to act; and (5) damage
resulted from the plaintiff's reliance on the statement.  *See,
e.g., Lillien v. Peak6 Invs., L.P.*, No. 03 C 2292, 2004 WL 1445231,
at *3 (N.D. Ill. June 25, 2004) (Zagel, J.) (citing *LaScola v. U.S.
Sprint Communications*, 946 F.2d 559, 567-68 (7th Cir. 1991)), *aff'd*
417 F.3d 667 (7th Cir. 2005).

J.) (citations omitted). "[T]he burden on a plaintiff claiming promissory fraud is deliberately high" since this would otherwise convert many breach of contract claims into torts. *Id.* at *16 n.15 (citing *Bower v. Jones*, 978 F.2d 1004, 1012 (7th Cir. 1992)). Unlike its fraud claim, LM's claim for fraudulent inducement alleges that SOG fraudulently induced LM to agree to the AF2 endorsement by promising to guarantee the premium installment payments when it knew that it would not perform as promised. SOG/Dalrada's motion for summary judgment focuses on the reliance aspect of this claim, arguing that there is no evidence that LM relied on anything SOG said in deciding to issue the AF2 endorsement.[22]

Taking the facts in the light most favorable to LM, it is possible that a finder of fact could determine that SOG fraudulently induced LM to agree to pay the AF2 claims. If a finder of fact determines that SOG orally represented to LM that it would agree to the terms of the revised August Letter without any intention to do so, and that LM relied on those representations in paying the AF2 claims, LM may be able to prove its claim for fraudulent inducement. Therefore, SOG/Dalrada's motion for summary judgment on this claim is denied.

---

[22]LM has not moved for summary judgment on this claim.

Both SOG and LM have moved for summary judgment on LM's conversion claim. A claim for conversion requires

> (1) defendant's unauthorized and wrongful assumption of control, dominion or ownership over plaintiff's personal property; (2) plaintiff's right in the property; (3) plaintiff's right to immediate possession of the property, absolutely and unconditionally; and (4) plaintiff's demand for possession of the property.

*Roderick Dev. Inv. Co. v. Cmty. Bank*, 282 Ill. App. 3d 1052, 1057, 218 Ill. Dec. 297, 301, 668 N.E.2d 1129, 1133 (Ill. App. Ct. 1996). *See also U.S. Int'l Reinsurance Co. v. Saturn Intermediaries, Ltd.*, No. 91 C 3739, 1992 U.S. Dist. LEXIS, 2683 at *8 (N.D. Ill. March 9, 1992) (Conlon, J.). The test emphasizes that the plaintiff must have an *absolute* and *unconditional* right to the property. *Id.* Here, LM's conversion claim alleges that it has the right to payments AF2 made to SOG. However, even if LM can establish that SOG owed LM additional premium payments for the coverage LM provided for AF2 claims, LM cannot show that it was owed the specific monies AF2 paid to SOG or even the amounts of those monies. Unlike the *Saturn* case relied upon by LM, the contracts at issue here did not provide that the payments made to SOG go to LM (though they arguably were for SOG to make premium payments to some insurance carrier). The only payment the agreements might have specifically required to be paid by AF2 to LM was the initial $1,100,000 payment contemplated in the August Letter, and AF2

directly transmitted that payment to LM. I therefore grant summary judgment for defendants on LM's conversion claim.[23]

For the same reason, SOG is also entitled to summary judgment on LM's constructive trust claim. A claim for constructive trust requires this court to find that SOG wrongfully acquired AF2's premium payments, and that those premium payments rightfully belong to LM. *See Suttles v. Vogel*, 126 Ill. 2d 186, 193, 127 Ill. Dec. 819, 822-23, 533 N.E.2d 901, 904-05 (1988). LM alleges that SOG had a fiduciary duty to both AF2 and LM, and that it breached that duty when it failed to pass along AF2's premium payments to LM. Again, however, while SOG might have breached its fiduciary duty to AF2, there is no evidence that any money AF2 provided to SOG clearly belongs to LM, such that this court should declare a constructive trust. *Id.* at 194, 127 Ill. Dec. at 823, 533 N.E.2d at 905 ("[T]he grounds for a constructive trust must be so clear, convincing, strong and unequivocal as to lead to but one

---

[23]In *Rodrick Dev.*, cited by the plaintiff in its reply brief, the court distinguished between a specific amount of money paid to the defendant by a third party which is earmarked for the plaintiff and a case in which the defendant accrues money from the plaintiff which is not identified for a specific purpose. In the latter, an action for conversion cannot stand. *Rodrick Dev.*, 282 Ill. App.3d at 1064, 218 Ill. Dec. at 305-06, 668 N.E.2d at 1137-38. This case is the latter. In addition, the Georgia case referenced in *Rodrick* and cited by plaintiff in its reply brief can be distinguished from this case because in that case the broker had specifically billed the client for the premium payments owed to the insurer which the client then paid to the broker. *Id.* (citing *Unified Servs., Inc. v. Home Ins. Co.*, 218 Ga. App. 85, 460 S.E.2d 545 (Ga. Ct. App. 1995)).

37

conclusion.") (citations omitted). Even considering the facts in the light most favorable to LM, LM has not made such a case. For these reasons, I grant SOG summary judgment as to LM's claims for conversion and constructive trust.

IX.

For the same reasons that I must grant summary judgment to SOG on LM's conversion and constructive trust claims, I must grant summary judgement on LM's unjust enrichment claims (brought against SOG, Dalrada and the Expert HR defendants). LM's claims focus, like these other claims, on the payments AF2 made to SOG to secure workers' compensation coverage. By bringing these claims against Dalrada and the Expert HR defendants as well as SOG, LM presumably argues that these premium payments are now partially in the possession of these parties or that these parties benefitted from the payments AF2 paid SOG. A claim for unjust enrichment in these circumstances requires a showing that either (1) the benefit should have been given to the plaintiff, but the third party mistakenly gave it to the defendant instead; (2) the defendant procured the benefit from the third party through some type of wrongful conduct, or (3) the plaintiff for some other reason had a better claim to the benefit than the defendant. *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 131 Ill. 2d 145, 161-62, 137 Ill. Dec. 19, 26, 545 N.E.2d 672, 679 (1989).

Here, however, LM cannot show that it has a superior claim to these payments than defendants. If LM had an agreement with SOG to provide insurance coverage for AF2, it was with SOG and not AF2. Therefore, SOG and not AF2 had the responsibility to make the premium payments. Further, LM cannot even show that the premium payments AF2 made to SOG were specifically for coverage with LM – the CSA, which is the operable contract between SOG and AF2, does not specify with what carrier SOG will obtain workers' compensation coverage. As I stated earlier, it is entirely possible that the defendants do not have a right to these payments (and the record is not clear whether AF2 was successful in obtaining these payments back from them in its separate litigation), but LM has no basis to claim them. Defendants may have an obligation to pay additional monies to LM, but not necessarily these specific monies. Therefore, I grant summary judgment to defendants as to LM's claims for unjust enrichment.

## X.

Finally, I address LM's alter ego claim. This claim has two components – a claim as to Dalrada, and a claim as to the Expert HR defendants. A claim for alter ego is one to disregard the separate corporate identities of related corporate entities because one entity "is so controlled and its affairs so conducted that it is a mere instrumentality of another." *Main Bank of Chicago v. Baker*, 86 Ill. 2d 188, 205, 56 Ill. Dec. 14, 21, 427 N.E.2d 94, 101

(1981). In addition, it must be the case that "the observance of the fiction of separate existence would, under the circumstances, sanction a fraud or promote injustice." *Id.* While normally the alter ego doctrine is used to treat a parent corporation and subsidiary as one entity, this doctrine can also be applied to two subsidiaries owned by the same parent. *Id.* at 205, 56 Ill. Dec. at 22, 427 N.E.2d at 102. Evidence of control and instrumentality is usually shown by analyzing several factors including that the entities shared officers or employees, did not maintain separate corporate records or comply with corporate formalities, that one entity was kept undercapitalized at the expense of another, or that corporate funds were commingled. *Id.* at 205-06, 56 Ill. Dec. at 22, 427 N.E.2d at 102. *See also Fiumetto v. Garrett Enters., Inc.,* 321 Ill. App. 3d 946, 958-59, 255 Ill. Dec. 510, 523, 749 N.E.2d 992, 1005 (Ill. App. Ct. 2001) (listing additional factors, including "non-functioning of other officers or directors" and "whether the corporation is a mere facade for the operation of dominant stockholders").

Here, I must address these issues both as to Dalrada and as to the Expert HR defendants. First, as to Dalrada, it is undisputed that Dalrada was the sole shareholder of SOG, which was the sole shareholder of Source One, LLC. During the relevant time period in this litigation, Bonar was director and CEO of Dalrada, the CEO of SOG, and for a time was the sole officer of SOG. In the course of

negotiating with LM for the AF2 endorsement, Bonar offered Dalrada stock as security for SOG's premium payments. There is a contested allegation that Bonar commingled some of the money SOG received from AF2 and that this money may have ended up with Dalrada. There is no evidence that SOG did not keep separate records, that it was undercapitalized, or that other monies were commingled. Further, LM has made no specific showing that finding Dalrada not to be the alter ego of SOG would promote a fraud or sanction injustice (such as an insolvency that would prevent SOG from paying any award to LM). Bonar is the key connection between Dalrada and SOG in this case. While Bonar was very involved in many of the events giving rise to this litigation, and indeed may bear some responsibility for what occurred, he was acting in his capacity as an employee of SOG and not of Dalrada. Even considering the facts in the light most favorable to the plaintiff, there are not enough facts to warrant treating Dalrada as the alter ego of SOG.

As for the Expert HR defendants, the situation here is more complicated. First, the basis for the Expert HR defendants' motion for summary judgment rests on the argument that this court lacks personal jurisdiction over the defendants. As this court explained in its memorandum opinion and order dated July 29, 2005, this court can exercise personal jurisdiction over the Expert HR defendants if Illinois would have such jurisdiction. *Hyatt Int'l Corp. v. Coco*, 302 F.3d 707, 713 (7th Cir. 2002). Illinois courts can "'exercise

jurisdiction on any . . . basis now or hereafter permitted by the Illinois Constitution and the Constitution of the United States.'" *Id.* at 714 (quoting 735 Ill. Comp. Stat. 5/2-209(c)). The state and federal jurisdiction standards are not meaningfully different. Under the Illinois Constitution, state courts can exercise jurisdiction if "it is fair, just, and reasonable to require a nonresident defendant to defend an action in Illinois, considering the quality of and nature of the defendant's acts which occur in Illinois or which affect interests located in Illinois." *Rollins v. Ellwood*, 141 Ill. 2d 244, 275, 151 Ill. Dec. 384, 398, 565 N.E.2d 1302, 1316 (1990). Under the federal Constitution, jurisdiction is appropriate if the Expert HR defendants have "purposefully avail[ed]" themselves "of the privilege of conducting activities" in Illinois such that they could reasonably anticipate being haled into court there." *Burger King v. Rudzewicz*, 471 U.S. 462, 474-75 (1980) (citation omitted).

Here, even taking the evidence in the light most favorable to LM, the only potential basis for jurisdiction over the Expert HR defendants would be as the alter ego of SOG. It is not disputed that in 2003, Dalrada had near-total ownership over Greenland Corporation, which in turn owned the Expert HR defendants. The Expert HR defendants shared office space in Michigan with SOG, and shared some employees. Some SOG employees fraudulently held themselves out as having positions or levels of authority in the

42

Expert HR defendants that they did not have (both parties in this litigation agree that this is the case). SOG was the corporate entity that was the insured on the policies with LM and Travelers, and most correspondence with LM (and even with AF2) went though SOG. LM does not allege that it believed the Expert HR defendants were insureds on the policy or were parties to any agreement between SOG and LM.

In short, although there is some evidence that certain employees of SOG made representations on the Expert HR defendants' behalf, there is no evidence that SOG commingled funds with the Expert HR defendants (the sole check SOG employees attempted to write on the Expert HR accounts was stopped), kept the same books, undercapitalized Expert HR, or even represented to LM that the Expert HR defendants were significantly involved in the insurance contract at issue.[24] Further, like LM's alter ego claim against Dalrada, LM has not shown that the Expert HR defendants must be treated as an alter ego of SOG in order to avoid fraud or injustice. Here, it would seem to actually allow an injustice to force the Expert HR defendants to answer for the activities of SOG since LM acknowledges that the representations of the SOG

---

[24]In making these determinations, I have not relied on the Expert HR defendants' response to LM's Rule 56.1 Statement. Under Local Rule 56.1(b), responses must contain "in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon." The Expert HR defendants have not done so, but instead have issued unsupported denials for the vast majority of LM's Rule 56.1 Statement. This response is improper, and is therefore stricken.

43

employees, including those purportedly on behalf of the Expert HR
defendants, were made without the knowledge of the Expert HR
defendants' management. *See Koch Refining v. Farmers Union Cent.
Exch., Inc.*, 831 F.2d 1339, 1345 (7th Cir. 1987) (citation omitted)
(recognizing that the alter ego doctrine is an equitable doctrine
which should be used to prevent inequitable results).[25] For this
reason, I grant summary judgment for the defendants as to LM's
alter ego claim.[26]

## XI.

SOG/Dalrada's motion for summary judgment includes a motion
for LM's statutory recovery of interest and specific performance
claims. However, both of these claims could potentially succeed if
LM succeeds on its breach of contract claim. For this reason,
summary judgment on these claims is inappropriate at this time.

## XII.

For the reasons discussed above, I hereby grant summary
judgment to the defendants on LM's promissory estoppel, fraud,

---

[25]*See, e.g., Am. Home Ins. Co. v. Travelers Indem. Co.*, 122
Cal. App.3d 951, 966, 175 Ca. Rptr. 826, 834 (Ca. App. Ct. 1981)
(recognizing that "[t]he corporate entity is disregarded to prevent
fraud or an injustice, not to inflict an obligation on an innocent
corporation" and that "[t]he fraud or inequity sought to be
eliminated must be that of the party against whom the alter ego
doctrine is invoked").

[26]As noted above, even if some other basis for jurisdiction did
exist, for other reasons I must grant summary judgment for the
Expert HR defendants as to the other claims against them (LM's
unjust enrichment, negligent misrepresentation, and negligent
omission claims).

44

unjust enrichment, conversion, constructive trust, and alter ego claims. I also grant summary judgment for the Expert HR defendants on LM's negligent misrepresentation and negligent omission claims. Because there are no longer any claims pending against Dalrada or the Expert HR defendants, these parties are dismissed from the case. LM may proceed on its breach of contract, statutory recovery of interest, specific performance, and fraudulent inducement claims against SOG.

                    **ENTER ORDER:**

                    *Elaine E. Bucklo*
                    _____

                       **Elaine E. Bucklo**
                    United States District Judge

Dated: July _18_ , 2006